Walter S. HUNT, and Kathryn A. Hunt, husband and wife, Appellants,

v.

Robert A. SCHEER, and Patricia A. Scheer, husband and wife, Appellees.

No. 49062.

Court of Appeals of Oklahoma, Division No. 1.

Dec. 21, 1976.

Rehearing Denied March 29, 1977.

Certiorari Denied Oct. 4, 1977.

Released for Publication by Order of Court of Appeals Oct. 7, 1977.

Ronald D. Cox, Oklahoma City, for appellants.

Liebel & Shumake by David S. Shumake, Oklahoma City, for appellees.

ROMANG, Judge:

This suit was brought to recover damages suffered by plaintiffs as a result of Kathryn A. Hunt being bitten by a dog owned and kept by the defendants, Robert A. Scheer and Patricia A. Scheer, husband and wife. Trial of this case before a jury resulted in a verdict and judgment for the defendants. Plaintiffs, Walter S. Hunt and Kathryn A. Hunt, husband and wife, have appealed.

The sole question for decision is whether there was evidence that defendants' dog was provoked to bite and injure Mrs. Hunt within the meaning of the term "provocation" as used in 4 O.S.1971, § 42.1, which reads:

"The owner or owners of any dog which shall, without provocation, bite or injure any person while such person is in or on a public place, or lawfully in or upon the private property of the owner or owners of such dog, shall be liable for damages to any person bitten or injured by such dog to the full amount of the injury sustained.

1 Okla. Law Rev. 110–111, reads as follows:

"Oklahoma's Twenty-First Legislature, in conformity with a trend set in other jurisdictions, enacted a statute which comes very near to imposing absolute liability on the owner of a dog for any injuries inflicted by the dog.

"The difficulty of applying the common law rule while keeping the application in line with a desirable public policy undoubtedly had its influence on the legislature. There is a feeling on the part of the public generally that one who chooses to harbor a dog on his premises should be responsible for the acts of the animal; and in the absence of provocation by the victim, the public looks to the owner for redress. The propriety of allowing such relief is underscored by the ever-increasing number of states which have imposed absolute liability."

The dog involved was a Doberman Pinscher. It was a little over a year old. Its weight was about 90 pounds, and it stood about 3½ feet tall. The defendant owners of the dog had advertised it for sale. Plaintiffs telephoned defendants in response to the newspaper ad, and then went to defendants' home to see the dog and possibly buy it. The events just prior to the biting were described by the defendant, Mrs. Scheer, as follows:

"Q What did Mrs. Hunt do when you were in the garage?

A Well, they both petted him, you know, and looked him over, and then my husband and Mr. Hunt were talking to one side and Mrs. Hunt was squatted down on the floor petting him and I was standing in front of them.

Q All right. When you say petting him or patting him, what do you mean?

A Well, he was sitting down and his front legs were straight, and she was rubbing him on the neck and on the head and behind his ears. Petting him.

Q How long was she doing this?

A Approximately five to ten minutes.

\*   \*   \*   \*   \*   \*

Q Did they do anything unusual in rubbing this dog?

A When she was petting him—No, she was just rubbing his ears and petting his neck.

Q Was she talking to the dog?

A Well, yes. She was, you know—She was talking to him, and then she and I were talking, you know, about him.

Q Then what happened?

A Well, she bent her head down looking at his feet, towards his feet, and when she bent her head down, the hair on the top of her head—Her hair was cut short then, curly, touched his face.

\* \* \* \* \* \*

A She bent her head down in the direction of his feet and when her hair touched the top of his head, then he bit her once."

Mr. Hunt testified:

"Q And what was your wife doing?
A She was crouched down patting the dog on the back of the head and on the neck.

\* \* \* \* \* \*

A Well, as I recall, she was crouched down and she turned her head to say something to me. I was on her right, and as she turned her head her hair got very close to the dog's face and he at that time grabbed her on the top of the head, and I saw him bite at least twice. I think at the emergency room they indicated there may have been three bites.

\* \* \* \* \* \*

A Well, I saw a bite on the top of the head where they initially shaved it approximately the same size that Mrs. Scheer said. I saw another shaved spot on the back of the head down around here that looked like to me a totally separate bite. There was laceration on the lower one and the upper one. They cleaned the wounds and sutured them up and gave her sedatives and tranquilizers and waited for her to be sedated before she was released."

Mrs. Hunt testified:

"A Well, then I squatted down and the dog was sitting on my right and Walter was on this side of me, and we were just talking, and I said something to Walter. I had my head turned like this, and the dog was right here, and the next thing I knew he was on top of me. I could feel the pressure of his jaws on my head.

\* \* \* \* \* \*

Q Okay. Explain in some detail what you were doing and exactly when the dog bit you?
A I was squatted down and my head was turned, and I was talking to my husband, and that is all.
Q What kind of tone were you talking in?
A Just a normal—like now.
Q Okay. Where were your hands?
A I probably had them on my knees, so I wouldn't lose my balance from being squatted down.
Q Okay. Did you make any sudden movements?
A No.
Q Any loud noise?
A No.
Q How long had you had your head turned prior to him biting you?
A Well, I am not sure exactly, but we were talking. I didn't just turn it. He didn't jump just the minute I turned my head. We were talking.
Q Okay. Where did the dog bite you?
A Well, I felt on my head.
Q Okay. How many times?
A Three. I felt the pressure of his jaws coming down from here to here three times."

And on cross-examination, Mrs. Hunt further testified:

"Q Yes. But my question was: Did you have any sensation that your hair had come in contact with the dog?
A No.
Q You say that the dog bit you three times?
A Yes.
Q And that there were holes all the way around your head?
A Uh-huh."

The above evidence clearly shows that there was no intentional provocation on the part of plaintiffs.

The State of Illinois has a dog bite statute which is very similar to 4 O.S.1971, § 42.1. In the case of *Nelson v. Lewis,* 36 Ill.App.3d 130, 344 N.E.2d 268 (1976), we note the following:

"On the date of her injury, plaintiff Jo Ann Nelson, a two and a half year old, was playing 'crack-the-whip' in defendant's backyard with his daughter and other children. Jo Ann was on the end of the 'whip'. The testimony shows that after she had been thrown off the whip, Jo Ann fell or stepped on the dog's tail while the dog was chewing a bone. The dog, a large Dalmatian, reacted by scratching the plaintiff in her left eye.

\*     \*     \*     \*     \*     \*

"Provocation is defined as an act or process of provoking, stimulation or incitement. Webster's Third New International Dictionary. Thus it would appear that an unintentional act can constitute provocation within the plain meaning of the statute.

\*     \*     \*     \*     \*     \*

"Although we believe that the instant statute does not impose liability upon a dog owner whose animal merely reacts to an unintentionally provocative act, the present appeal does not involve a vicious attack which was out of all proportion to the unintentional acts involved. E. g. *Messa v. Sullivan,* supra. The dalmatian here apparently only struck and scratched plaintiff with a forepaw in response to the plaintiff's stepping or falling on its tail while it was gnawing on a bone, an act which scarcely can be described as vicious. Therefore we hold that 'provocation' within the meaning of the instant statute means either intentional or unintentional provocation; that the defendant's dog was provoked by the plaintiff's unintentional acts and did not viciously react to these acts; . . ."

In the instant case, defendants assert in their answer brief as follows:

"It was undisputed that Mrs. Hunt raised cats, had bathed before going to see the dog, but had not washed her hair or put anything on it."

Assuming that the hair of Mrs. Hunt touched the face of the dog, and/or that she may have had some scent of cats on her hair, we do not believe that the term "provocation" as used in 4 O.S.1971, § 42.1, was intended to exculpate liability in that type of situation for a vicious attack by a dog inflicting serious injuries. See *Messa v. Sullivan,* 61 Ill.App.2d 386, 209 N.E.2d 872, 876 (1965).

At the close of all the evidence in the instant case, plaintiff asked for a directed verdict on the question of liability, which request was denied. In *Aetna Life Ins. Co. v. Mosburg,* 188 Okl. 371, 109 P.2d 493 (1941), the syllabus states:

"Where, under the evidence, a plaintiff is entitled to a directed verdict save for the amount of his recovery it is error to refuse a requested instruction to this effect."

In view of the evidence, we conclude that it was error to deny the request for a directed verdict on the question of liability.

The verdict and judgment are reversed, and this case is remanded with directions to enter judgment for plaintiffs on the issue of liability, and to proceed to a new trial on the question of plaintiffs' damages.

The accrued court costs, including the charge for the transcript of $166.50, are taxed against the defendants.

**REVERSED AND REMANDED WITH DIRECTIONS.**

REYNOLDS, P. J., concurs.

BOX, J., dissents.